**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **SEAN S. BACH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:13-CV-00888-CCE-JLW** |
| ) | |
| **LAW SCHOOL ADMISSION COUNCIL,** ) | |
| **INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## LSAC'S TRIAL BRIEF

Pursuant to the Court's Notice of August 20, 2014 (D.E. 62) and L.R. 40.1(c), defendant

Law School Admission Council ("LSAC") respectfully submits its trial brief in this matter.

## NATURE OF THE MATTER BEFORE THE COURT

Plaintiff Sean Bach is a graduate of Bates College and the Duke University Fuqua School

of Business. He now wishes to attend law school, and has requested accommodations of

extended time on all sections of the Law School Admission Test ("LSAT") and a private room in

which to test. Mr. Bach claims that he is entitled to these accommodations under the Americans

with Disabilities Act ("ADA") because he has been diagnosed with an Attention-

Deficit/Hyperactivity Disorder (ADHD). LSAC denies that Mr. Bach is entitled to any

accommodations.

ADHD is a lifelong impairment with childhood onset that disrupts individuals across

multiple settings. Mr. Bach, however, was not diagnosed with ADHD until he was 23 years old,

in connection with his desire to obtain testing accommodations on the GMAT business-school

entrance exam (accommodations were denied). He has been highly successful in his work and

academic endeavors and has performed exceedingly well on other standardized tests, *without* accommodations.  Regardless of whether his ADHD diagnosis was correct (and LSAC contends that it was not), it is clear that Mr. Bach is not substantially limited in any major life activity and thus does not qualify as disabled within the meaning of the ADA.  He does not need extra testing time or a private room in order to take the LSAT on a level playing field with other examinees.  Providing such accommodations would give him with an unfair advantage over examinees who must test under standard testing conditions, as well as examinees who legitimately need such accommodations.

## BACKGROUND

### I.      LSAC and the Law School Admission Test

LSAC is a non-profit membership organization.  *See* Decl. of Kim Dempsey (D.E. 56-1) at ¶ 4.[1]  LSAC provides services for its member schools and individuals who wish to attend law school, including developing and administering the LSAT examination.  *See id.*  Law schools across the country rely upon LSAT scores as one factor among many in evaluating admission applications.  *See id.* at ¶ 5.

The LSAT is a standardized test.  *See id.* at ¶ 7.  With limited exceptions, all examinees take the LSAT under the same testing conditions, including standard testing time.  The primary exception is for disabled individuals who need reasonable accommodations.  *See id.* at ¶ 8.

LSAC conscientiously evaluates each accommodation request.  It does so to ensure that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide

---

[1] Dr. Dempsey, Psy.D., is the Manager of Accommodated Testing for LSAC.  She will be testifying at trial on behalf of LSAC.

them with an unfair advantage when taking the ... examination." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 88-89 (2d Cir. 2004); *see also* D.E. 56-1 at ¶¶ 7-9.

## II. Mr. Bach's LSAT History and the Procedural History in this Matter

Mr. Bach filed two motions at the outset of this case seeking emergency preliminary relief that would have provided him with his requested testing accommodations on the December 2013 administration of the LSAT. D.E. 13, D.E. 30. After his initial motion for a preliminary injunction and a subsequent motion for temporary restraining order were denied by the Court, *see* D.E. 47, Mr. Bach filed another motion for preliminary injunction seeking accommodations on the February 2014 LSAT. D.E. 49. The Court also denied this motion. D.E. 58.[2] The Court found that Mr. Bach had "not established that he is likely to succeed on the merits," explaining:

> Mr. Bach contends that his ADHD substantially limits his thinking, concentrating, learning, reading, and writing. . . . However, much of his evidence focuses on his low clinical test scores relative to his own intellect, not in comparison to the general population, tending to indicate that his ADHD does not substantially limit a major life activity. . . . Moreover, Mr. Bach's long history of academic success weighs against a finding of disability. . . .

D.E. 58 at 3-4 (citations omitted).[3] In addition, the Court found that Mr. Bach had not established that injunctive relief was necessary to protect against irreparable harm, and that the balance of equities weighed against preliminary relief. *Id.* at 4-5. Finally, the Court found that the public interest did not weigh in favor of either party, noting: "Although the public certainly

---

[2] The preliminary injunction decision is available at 2014 U.S. Dist. LEXIS 124632 (M.D.N.C. 2014).

[3] The Court noted that the 2008 amendments to the ADA "clarified that the term 'substantially limits' should be construed broadly in favor of expansive coverage," but also noted, correctly, that "they do not appear to have changed the test by which such limitation must be judged." D.E. 58 at 3 n.1 (citations omitted). The Court identified this issue as one "deserv[ing] further consideration on a full merits determination." *Id.* Accordingly, a discussion of the standards for determining disability under the 2008 amendments to the ADA is included *infra* at 12-15.

has an interest in the enforcement of the ADA, . . . the public also has an interest in the fair administration of standardized tests." *Id.* at 5 (citations omitted).

Mr. Bach took the February 2014 administration of the LSAT under standard testing conditions. He scored a 157, which is in the 71st percentile of all students who took the February 2014 LSAT. Thus, without any accommodations, he scored in the top third of all examinees on that date. Mr. Bach currently is registered to take the December 2014 administration of the LSAT.

## III. Mr. Bach's Academic and Testing History

### A. Academic History

#### 1. Primary and secondary school

Mr. Bach was a very successful student in primary and secondary school, without any academic accommodations. His kindergarten report card shows strong achievement and progress in all areas. *See* Pl. PI Ex. 22.[4] His first and second grade report cards reflect satisfactory academic achievement, with no reference to attention issues and only three comments providing mild, constructive feedback. Pl. PI Ex. 23-24. Mr. Bach's father suggested that his son might be bored in school, and a teacher identified possible gifted testing for the next year. *See id.* In third grade, Mr. Bach was an "outstanding student who especially excels at higher level thinking skills," and earned almost all A's. *See* Pl. PI Ex. 25-26. In fourth grade, Mr. Bach's teacher noted that he "does well in all areas," and encouraged him to "put forth the effort . . . he is capable of . . . ." Pl. PI Ex. 27. He was "a pleasure to have in class." *Id.* His final grades in fourth grade were all A's. LSAC00749.

---

[4] Mr. Bach's preliminary injunction exhibits were filed under seal, and therefore, there is no corresponding docket entry number to reference the exhibits.

Mr. Bach was referred for a psychological evaluation in fourth grade "due to his excellent school progress." Pl. PI Ex. 17 at 1. During testing, he "displayed an excellent attention span." *Id.* at 2. The evaluator concluded that Mr. Bach demonstrated "many of the characteristics often associated with superior students[,]" and that "[h]is abilities are manifested in his academic achievement." *Id.* at 2-3. There was no suggestion of any ADHD symptoms.

Mr. Bach's final grades in fifth grade were all A's. LSAC00747.

Mr. Bach's final grades in seventh grade were all A's, except for one B. LSAC00746. In eighth grade, Mr. Bach's final grades were almost all A's and B's, with one C+. *See* Pl. PI Ex. 29. Teacher comments reported positive characteristics ("cooperative student," "good student," "a pleasure to have in class," "always prepared for class," "applies learned concepts"), with the exception of comments noting "inconsistent effort" and "missing, late, or incomplete homework" in two classes. *Id.* His "effort" and "conduct" scores in twelve classes were "very good" or "satisfactory," with only one "needs improvement." *See id.*

In ninth and tenth grade, Mr. Bach earned A's, B's, and C's in his classes, including numerous honors classes. *See* Pl. PI Ex. 11. In eleventh and twelfth grade, Mr. Bach earned all A's and B's, including in many honors and AP (Advanced Placement) classes. *See id.* Mr. Bach has produced a smattering of high school mid-term reports where issues of effort and preparation are raised (in addition to many positive comments) with respect to a small number of Mr. Bach's thirty-one high school classes, *see* Pl. PI Exs. 30-38; most (five) of these reports are from the ninth grade, *see* Pl. PI Exs. 30-34, with one in tenth grade, *see* Pl. PI Ex. 35, and three from the eleventh grade, including two from the same class and one from Honors Calculus, when Mr. Bach's focus on the school play apparently put him behind class, *see* Pl. PI Ex. 36-38. Mr. Bach

performed well enough in high school to earn admission to Bates College, a "highly selective" liberal arts college. *See* http://www.bates.edu/admission/apply/.

2. College and graduate school

Mr. Bach graduated from Bates College in four years with a degree in Economics and a 3.21 GPA. *See* Pl. PI Ex. 10. He did not request or receive accommodations at Bates. *See* Bach Decl. (D.E. 51) at ¶ 22. Mr. Bach then attended the Duke University School of Business, graduating in May 2013 with a Master of Business Administration degree, a 3.651 GPA, and a Certificate of Excellence in Finance. *See* Pl. PI Ex. 9. While at Duke, Mr. Bach was approved to receive accommodations of 50% extra time on tests and quizzes and a minimal distraction testing area. *See* Pl. PI Ex. 8. He did not receive accommodations in any areas other than testing. *See id.* Business record documents produced and authenticated by Duke University in this action include an e-mail from the Director of Student Life at the Duke School of Business reporting that, for Mr. Bach: "in all honesty I don't think he even needs the accommodations he has now. He has been a problem student since day one at Fuqua and this morning is a perfect example of his manipulating the system every chance he gets." LSAC00683.

B. Standardized Testing History

Mr. Bach did not seek or receive accommodations on any of the standardized tests he took in primary or secondary school. On the Comprehensive Tests of Basic Skills taken in kindergarten and first grade, Mr. Bach earned scores ranging from the 88th percentile to the 99th percentile (except for spelling, which was in the 65th percentile). Pl. PI Ex. 19. On the Stanford Achievement Test in third grade, Mr. Bach earned scores ranging from the 92nd to 99th percentile. LSAC00749. On the Stanford Achievement Test in the fourth grade, Mr. Bach earned scores ranging from the 89th to 99th percentile. LSAC00749. On a standardized test

taken in the fifth grade, Mr. Bach earned scores ranging primarily from the 89th to the 94th percentile, with one score in the 56th percentile. LSAC00747. On the Stanford Achievement Test in the seventh grade, Mr. Bach earned scores ranging from the 71st percentile to the 99th percentile. LSAC00746. On the Comprehensive Testing Program exam in eighth grade, Mr. Bach earned scores ranging from the 95th to 99th percentiles. *See* Pl. PI Ex. 20.

Mr. Bach took the PSAT as a ninth-grader. *See* Pl. PI Ex. 21. He scored in the 46th percentile on the verbal section, 74th percentile on the math section, and the 58th percentile on the writing skills section. *See id.*

Mr. Bach took the SAT college admissions test two times in his junior year, scoring 630 on the reading section both times and 640 and 660, respectively, on the math section. *See* Pl. PI Ex. 14. Mr. Bach has reported his scores as falling between the 84th and 87th percentiles. *See* D.E. 51 at ¶ 21. Mr. Bach took the ACT in the fall of his senior year, scoring in the 93rd percentile nationally. *See* Pl. Ex. 13.

Mr. Bach took the Graduate Management Admission Test ("GMAT") in January 2010. *See* Pl. PI Ex. 12. This was the first standardized test for which Mr. Bach sought accommodations, and his request was denied by the Graduate Management Admission Council. He tested under standard conditions, and earned a composite score in the 92nd percentile, *see* Pl. PI Ex. 12, which means that he performed in the top 8% of all of the extremely bright and capable individuals who took that test in order to apply to business school.

Finally, as noted above, Mr. Bach scored in the 71st percentile when he took the LSAT in February 2014 under standard conditions, placing him well above average compared to other bright college students and college graduates who are seeking to attend law school. LSAC01434.

## IV.    Mr. Bach's Work History

According to Mr. Bach's online LinkedIn profile, which he presumably prepared, he is currently working in Chicago, Illinois, as a Vice President for Pegasus Intellectual Capital Solutions, a boutique investment bank. *See* S. Bach LinkedIn Profile, *at* http://www.linkedin.com/in/seansbach (identifying himself as an "Experienced Investment Banking Professional, Seasoned Entrepreneur, and Legal Scholar."). Mr. Bach also is working as an Associate in Research for Duke University Law School Professor Steven L. Schwarcz, and as a Special Advisor to the Chief Financial Officer of ReserveBar, an online distributor of alcoholic beverages. *See id.*

Mr. Bach previously served successfully as a Summer Associate, Mentored Study Associate, and Senior Associate in the Investment Banking Division of MD Global Partners, LLC, in New York City. *See id.* In these positions, he created comprehensive financial models and detailed business, market, and valuation analyses; performed complex screening processes to identify specific investor universes for several transactions; sourced a list of several hundred appropriate investors, performing an individual analysis of suitability for each; and designed and co-created a Confidential Information Memorandum, consisting of nearly 50 pages and 28 custom and stylized tables, charts, and graphs. *See id.*

According to his profile, Mr. Bach is also the co-founder and former Vice President of Jewelry Depot, a business he formed with his parents when he was fourteen years old. *See id.* Mr. Bach says that he developed the Jewelry Depot into one of the largest single-standing retail jewelry stores in the Southeastern United States. *See id.* At Jewelry Depot, he negotiated and executed a multi-stage acquisition, authoring all of the M&A agreements, effectively quintupling

the size of his company.  *See id.*  He also forged a new, high-quality supply pipeline in key East Asian markets.  *See id.*

## V.     Mr. Bach's Claimed Impairment

### A.     Rivera Evaluation

When he was twenty-three years old, Mr. Bach sought psychological testing from Enrique Rivera, Ph.D.  *See* D.E. 51 at ¶ 24; *see also* Pl. PI Ex. 7 at 1.  He did so because he was planning to take the GMAT exam and wanted to get extra testing time.  The only context in which Mr. Bach identified any problems was taking timed tests.  He reportedly was "doing very well in his current position in the family business."  Pl. PI Ex. 7 at 2.  Dr. Rivera diagnosed Mr. Bach with ADHD, Predominantly Inattentive Type, and recommended that Mr. Bach be allowed more time for tests.  *See id.* at 5.

### B.     Singer Evaluation

Mr. Bach received an updated psychological assessment from Mandi Singer, Ph.D., in July 2013, for the specific purpose of seeking accommodations on the LSAT.  *See* Pl. PI Ex. 5.

In her summary and recommendations, Dr. Singer stated, among other things, that Mr. Bach's "high intelligence and ability to adapt helped him be successful in school prior to receiving accommodations," but opined that his "scholastic performance was not a true representation of Sean's ability levels."  Pl. PI Ex. 5 at 9.  She noted that Mr. Bach "did fine, even above average on most classes and standardized tests," but speculated that he "probably could have performed even better with earlier diagnosis, treatment, and appropriate accommodations."  *Id.*  Dr. Singer found that, based on his psychological test scores, Mr. Bach

met the criteria for ADHD, inattentive type (mild to moderate). *See id.*[5] Dr. Singer recommended that Mr. Bach receive 50% additional testing time on all portions of any standardized test and be allowed to test in a separate room. *See id.* at 10.

## C. Byassee Evaluation

After LSAC denied his first request for testing accommodations, Mr. Bach sought an additional evaluation from James Byassee, Ph.D., again for the specific purpose of obtaining testing accommodations on the LSAT. *See* Pl. PI Ex. 1 at 1. Dr. Byassee administered additional computerized attention testing, which reportedly "showed serious deficiencies in both visual and auditory attention, although some difficulties developed with the visual test that would need re-administration to fully resolve." *Id.*[6] Dr. Byassee concluded that Mr. Bach's clinical history and various historical documents were consistent with an individual who had ADHD symptoms of impairment as a child, noting, in part:

> Likely because of his intelligence, he was successful generally as a student, with some degree of waxing and waning, which is also typical of a gifted student with ADHD. He was able to compensate and reach levels of academic excellence, although again as is often found among ADHD students, he was unable to maintain that level of persistence compensatory performance all of the time.

*Id.* Dr. Byassee noted "deficits" in Mr. Bach's neuropsychological processing speed, as well as deficits in reading speed, writing speed, and math speed, not in an absolute sense, but "all

---

[5] Dr. Singer gave Mr. Bach a "Global Assessment of Functioning" (GAF) score of 83 under the DSM-IV-TR multiaxial diagnosis, *see* Pl. PI Ex. 5 at 10, which means: "Absent or minimal symptoms (e.g., mild anxiety between exams), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)." DSM-IV-TR at 34.

[6] In the report on Mr. Bach for the visual Test of Variables of Attention (TOVA), the "symptom exaggeration index" cautions: "Based on the subject's pattern of performance, there is some evidence of possible symptom exaggeration. If the potential exists for secondary gain, a deliberate effort to exaggerate symptoms should be considered." Pl. PI Ex. 41 at 2.

relative to Mr. Bach's Superior IQ score." *Id.* He concluded that Mr. Bach should receive time-and-a-half extended time on tests and a private, non-distracting room. *See id.* at 7.

### D. Walker Treatment

Mr. Bach came under the care of Ellen Walker, M.D., in October 2011, and Mr. Bach submitted a short letter from Dr. Walker in support of his request for testing accommodations on the LSAT. Pl. PI Ex. 40. Dr. Walker has described the severity of Mr. Bach's ADHD symptoms as "mild." Walker Dep. at 54:19-21.

### E. Adler Evaluation

Lenard Adler, M.D., may be offered as an expert witness for Mr. Bach in this action. Dr. Adler is expected to testify that Mr. Bach is properly diagnosed with ADHD and requires accommodations on the LSAT based on his claimed impairment.

## VI. Mr. Bach's Trial Witnesses

Mr. Bach has disclosed four likely trial witnesses in addition to himself: Dr. Adler, Dr. Walker, Dr. Singer, and Dr. Byassee. Notably, Mr. Bach is not offering the testimony of a single witness who could corroborate his self-reported impairment in social, academic, or occupational domains. His parents are not testifying (notwithstanding the fact that ADHD is a neurodevelopmental disability with childhood onset and Mr. Bach has claimed significant problems in primary and secondary school); his long-time girlfriend is not testifying (notwithstanding the fact that Mr. Bach is claiming significant impairment in the social domain due to his ADHD symptoms); no former teachers are testifying (notwithstanding the fact that Mr. Bach claims to have suffered significant impairment from his ADHD symptoms in primary, secondary, and post-secondary school and on standardized tests); and no current or former

employers are testifying (notwithstanding the fact that Mr. Bach claims to experience significant problems in his work endeavors due to ADHD).

<u>**QUESTION PRESENTED**</u>

Does Sean Bach suffer from an impairment that substantially limits him in performing a major life activity relevant to taking the LSAT, as compared to most people in the general population, so as to warrant extra testing time and a private testing room under the ADA?

<u>**ARGUMENT**</u>

**I.     TO ESTABLISH A COVERED DISABILITY UNDER THE ADA, MR. BACH MUST PROVE THAT HE SUFFERS FROM AN IMPAIRMENT THAT SUBSTANTIALLY LIMITS HIS ABILITY TO PERFORM ONE OR MORE MAJOR LIFE ACTIVITIES.**

**A.     Disability Under The ADA, As Amended:   Substantial Limitation In A Major Life Activity Compared To Most People In The General Population.**

LSAC is subject to a specific provision of Title III the ADA, 42 U.S.C. § 12189, which prescribes:

> Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.   Thus, the ADA requires LSAC to offer the LSAT in a place and manner that is accessible to individuals with disabilities.

An individual is disabled within the meaning of the ADA if he or she has "a physical or mental impairment that substantially limits one or more major life activities . . . ."  42 U.S.C. § 12102(1)(A).  In the ADA Amendments Act of 2008 ("ADAAA"), Congress emphasized that the statute should be construed to provide "broad coverage."  42 U.S.C. § 12102(4)(A); *see also Summers v. Altarum Instit.*, 740 F.3d 325, 329 (4th Cir. 2014).   Nevertheless, an individual

seeking disability-based accommodations or pursuing a claim of disability discrimination must still prove that he is, in fact, disabled within the meaning of the statute. *See* 42 U.S.C. § 12102(4)(A); *see also, e.g., Neely v. PSEG Texas, LP*, 735 F.3d 242, 245 (5th Cir. 2013) ("Although the text of the ADAAA expresses Congress's intention to broaden the definition and coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination."); *cf. Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 n.10 (4th Cir. 2012) (noting plaintiff had not proven himself to be disabled under either the original version of the ADA or under the ADAAA); *Scavetta v. Dillon Cos.,* No. 13-1311, 2014 U.S. App. LEXIS 12133, at *8-9 (10th Cir. June 27, 2014) (reiterating that there is no "per se" disability under the ADAAA) (citation omitted).

Even under the ADAAA, not every impairment constitutes a covered disability, as confirmed by the statute's legislative history:

> By retaining the essential elements of the definition of disability including the key term 'substantially limits' we reaffirm that not every individual with a physical or mental impairment is covered by the . . . definition of disability in the ADA. An impairment that does not substantially limit a major life activity is not a disability under [the first prong of the definition]. That will not change after enactment of the ADA Amendments Act, nor will the necessity of making this determination on an individual basis. . . .

> We believe that the manner in which we understood the intended scope of "substantially limits" in 1990 continues to capture our sense of the appropriate level of coverage under this law for purposes of placing on employers and other covered entities the obligation of providing reasonable accommodations and modifications to individuals with impairments. As we described this in our committee report to the original ADA in 1989:

> A person is considered an individual with a disability for purposes of the first prong of the definition when [one or more of] the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people. A person who can walk for 10 miles continuously is not substantially limited in walking merely because on the eleventh mile, he or she begins to experience pain because most people would not

> be able to walk eleven miles without experiencing some discomfort.  S. Rep. No
> 101-116, at 23 (1989) . . . .
> Thus, we believe that the term "substantially limits" as construed consistently
> with the findings and purposes of this legislation establishes an appropriate
> functionality test for determining whether an individual has a disability.

Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act
Amendments Act of 2008, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008).[7]

Thus, although it is no longer necessary for an individual to show that he is "prevented" or "severely restricted" in his ability to perform a major life activity to establish a disability under the ADA, he still must show that, as a result of an impairment, he is ***substantially limited in his ability to perform a major life activity as compared to most people in the general population***.  *See, e.g., Weaving v. City of Hillsborough*, 763 F.3d 1106, 2014 U.S. App. LEXIS 15762, at *16-21 (9th Cir. Aug. 15, 2014) (reversing district court denial of judgment as a matter of law following jury verdict in favor of plaintiff with ADHD because he was not substantially limited compared to most people in the general population in the activities of working or interacting with others); *Crowell v. Denver Health & Hosp. Auth.*, No. 13-1355, 2014 U.S. App. LEXIS 13965, at *21 (10th Cir. July 23, 2014) (affirming judgment as a matter of law in favor of defendant where testimony of plaintiff's treatment provider showed she was not substantially limited in her ability to lift, sit, and walk compared to most people); *Mann v. Louisiana High Sch. Athletic Assoc.*, 535 Fed. Appx. 405, 410 (5th Cir. 2013) ("Although the ADA Amendments

---

[7] The Equal Employment Opportunity Commission (EEOC) has revised its regulatory definition of "substantially limits" to be consistent with the ADAAA.  The new regulation states: "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity ***as compared to most people in the general population***."  29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added).  Although the EEOC regulations only apply to Title I of the ADA and are not directly applicable in this Title III case, they are consistent with the legislative history quoted above.  The Department of Justice, the agency responsible for enforcing Title III of the ADA, has not yet issued regulations implementing the ADA Amendments Act.

Act of 2008 lowered the standard that plaintiffs must meet to show that they are disabled, . . . a plaintiff must still show substantial limitation . . . .") (citations omitted).  Mr. Bach's alleged impairment must be measured against most people in the general population, not other college graduates, investment bankers, or prospective law students, and not compared to his own actual or perceived intellectual potential.  *See Singh v. George Washington Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007) (explaining need to judge impairment relative to average person in general population, not with regard to other individuals attending medical school).

### B.    Assessing Disability Based on a Claimed ADHD Impairment

Mr. Bach claims that he is disabled within the meaning of the ADA due to his symptoms of Attention Deficit-Hyperactivity Disorder ("ADHD").   ADHD is a neurodevelopmental disorder. The diagnostic guidelines for ADHD are set forth in the Diagnostic and Statistical Manual of Mental Disorders, the most recent edition of which is the Fifth Edition (DSM-5). ADHD is not a learning disability.

To be properly diagnosed with ADHD, the diagnostic criteria of the DSM-5 requires a persistent pattern of inattention that interferes with functioning or development.  It must be documented beyond self-report that symptoms of ADHD have consistently and pervasively disrupted an individual's functioning in multiple domains.  D.E. 56-3 at ¶ 12.  There must be clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning.

Individuals are frequently diagnosed with ADHD despite showing little, if any, impairment as a result of their alleged symptoms.  As LSAC's expert witness, Michael Gordon, Ph.D., previously explained:

Because the DSM guidelines regarding impairment are so imprecise, clinicians have the option of assigning clinical diagnoses to individuals who show mild symptoms that have only limited impact on actual functioning. This wide berth for what is considered diagnosable is generally regarded as responsible for an explosion in the rates of ADHD identifications. According to a recent report by the Centers for Disease [C]ontrol and Prevention, 15% of all high school students have been assigned the diagnosis, even though research estimates put the prevalence at roughly 5% of the population. Twenty percent of children between the ages of 4 and 17 will have received an ADHD diagnosis at some point in their lives, a 16% increase since 2007 and a 14% rise over the past 10 years. The literature has noted a similar increase in the number of individuals receiving an initial ADHD diagnosis as an adult.

D.E. 56-3 at p.5 ¶ 22.[8] Indeed, the DSM-5 allows for an ADHD diagnosis to be applied to individuals with "mild" symptoms, meaning: "Few, if any, symptoms in excess of those required to make the diagnosis are present, and symptoms result in no more than minor impairments in social or occupational functioning."

Thus, in determining whether Mr. Bach is disabled under the ADA, it is appropriate to consider both Mr. Bach's diagnosis and the level of limitation he has actually experienced as a result of his claimed impairment of ADHD.

## II. MR. BACH IS NOT DISABLED WITHIN THE MEANING OF THE ADA.

As noted above, Mr. Bach must prove that he has a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). He cannot make this showing.

First, there is a significant question whether Mr. Bach suffers from a physical or mental impairment. Although Mr. Bach has been diagnosed with ADHD, the diagnosis does not appear

---

[8] Dr. Gordon will testify at trial on behalf of LSAC. He is a clinical psychologist and Professor Emeritus of Psychiatry at SUNY Upstate Medical University. He is also an Adjunct Professor of Psychology at Syracuse University. He specializes in the evaluation and treatment of children and adults with ADHD, and has worked in this area since the 1970's. He has published numerous books, articles, and book chapters, and delivered many paper presentations, on the topic of ADHD. *See* D.E. 56-3 at p.2 ¶ 2 and pp. 12-25.

to be consistent with applicable diagnostic criteria.  *Cf. Steere v. George Washington Univ.*, 439 F. Supp. 2d 17, 21 (D.D.C. 2006) (finding that plaintiff's "scraps of vague memories" of common childhood characteristics were not enough to establish early onset of ADHD and that, if plaintiff had the disability he claimed, the Court "might expect his achievement to have been more consistently impaired").  As Dr. Gordon has testified, "The facts of this case are as far from being supportive of an ADHD diagnosis as I can recall ever encountering in my 18 years of reviewing documentation in support of ADA-related accommodations."  D.E. 56-3 at ¶ 27.

Second, even if one accepts Mr. Bach's ADHD diagnosis at face value, merely having a diagnosed impairment is not enough to show a disability within the meaning of the ADA.  *See supra* at 12-15; *see also, e.g., Rudolph v. Buncombe Cty. Gov't*, 846 F. Supp. 2d 461, 471 (W.D.N.C. 2012) ("Having ADHD . . . does not necessarily dictate that the Plaintiff was disabled."), *aff'd*, 474 Fed. Appx. 931 (4th Cir. 2012); *cf. Costello v. UNC*, No. 03-1050, 2006 U.S. Dist. LEXIS 90519, at *12 (M.D.N.C. Dec. 14, 2006) ("[A] mere medical diagnosis of an impairment is insufficient to prove disability status.") (summary judgment to defendant on Rehabilitation Act claim).

Mr. Bach claims to be substantially limited in the major life activities of thinking, concentrating, learning, organizing, cognitive processing, reading, writing, and test taking. Complaint (D.E. 1) at ¶ 8.[9]  Mr. Bach cannot establish any of these claimed substantial limitations, when his performance is compared to most people in the general population.  *See generally* D.E. 56-3 at ¶¶ 29-30; Pl. PI Exs. 9-14, 17-38.  Individuals with Mr. Bach's record are

---

[9] The issue, of course, is whether Mr. Bach is substantially limited in any major life activity relevant to his ability to take the LSAT and, indeed, Mr. Bach's evaluators have focused on his alleged impairment with respect to taking timed tests.  *See* Pl. PI Ex. 1, 5, 7. Test taking itself, however, is not a major life activity.  *See Singh*, 508 F.3d at 1104; *Herzog v. Loyola College*, No. 07-2416, 2009 U.S. Dist. LEXIS 94454, at *16 n.4 (D. Md. Oct. 9, 2009).

not disabled within the meaning of the ADA.  *See, e.g., Rumbin v. Assoc. of Am. Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Conn. 2011) (rejecting ADA claim by individual who was denied accommodations on the MCAT exam and finding, "There is no evidence that he struggles to read significantly more than the average person, and he has worked, studied, and participated in hobbies without formal accommodations--that require reading."); *Rademaker v. Blair*, No. 10-3332, 2010 U.S. Dist. LEXIS 135306, at *11-12 (C.D. Ill. Dec. 22, 2010) (declining to find plaintiff's son disabled where he completed five semesters of high school with passing grades); *Herzog*, 2009 U.S. Dist. LEXIS 94454, at *19 ("Herzog's academic successes demonstrate his ability to perform at an above-average level both before and after being diagnosed with ADHD.").

As the Court previously concluded in denying Mr. Bach's motion for preliminary injunction, "Mr. Bach's long history of academic success weighs against a finding of disability." *Bach v. LSAC*, No. 1:13-cv-888, 2014 U.S. Dist. LEXIS 124632, at *4 (M.D.N.C. Feb. 4, 2014) (citations omitted).  And any testimony Mr. Bach may offer at trial as to difficulties he allegedly experiences in reading, processing information, or timely completing tests as a result of his ADHD is not sufficient to refute his compelling record of success in school, at work, and -- most importantly -- in taking timed, standardized tests.  *Cf. Fuoco v. Lehigh Univ.*, 981 F. Supp. 2d 352, 362 (E.D. Pa. 2013) (affirming summary judgment to defendant and noting:  "a mere preference for written rather than oral directions, general forgetfulness, and a proclivity for getting overwhelmed with too much information or when schedules become busy are insufficient to establish that she suffered from ADD to the extent that the disorder *substantially* limited her ability to think, learn, or work.  Indeed, I think most people prefer directions in writing and get overwhelmed with an abundance of information.") (citations omitted).

Furthermore, contrary to prior argument by Mr. Bach, LSAC is not required simply to defer to the conclusions reached by Mr. Bach's evaluators. This is particularly the case when Mr. Bach's evaluators failed to properly consider whether Mr. Bach was disabled within the meaning of the ADA, *i.e.*, substantially limited compared to most people. *See, e.g., Palotai v. Univ. of Maryland*, 38 Fed. Appx. 946, 955 (4th Cir. 2002) (unpublished); *Rhodes v. Langston Univ.*, 462 Fed. Appx. 773, 778 (10th Cir. 2011) ("Rhodes' neuropsychological evaluation does not answer the question of whether his impairment substantially limits Rhodes' ability to learn as a whole for purposes of daily living, as compared to most people. Rather, it is a comparison to a fictional person sharing his demographic characteristics and its purpose was to identify potential accommodations to help Rhodes with demanding classroom and clinical nursing courses."). Mr. Bach's evaluators base their opinions on the erroneous proposition that an individual is "disabled" if he has a "superior" IQ but is not "superior" in all of his abilities and accomplishments. *See* D.E. 56-3 at ¶ 30. There are numerous incorrect assumptions underlying the opinions and recommendations of Mr. Bach's evaluators, *see id.* at ¶ 30(A)-(E), and LSAC properly declined to follow their recommendations.

Mr. Bach may point to Duke University's provision of testing accommodations in business school as evidence of his disability. LSAC, however, is not required to simply follow the decision that Duke University made to provide Mr. Bach certain accommodations in business school. Receiving accommodations in an academic context is very different from receiving accommodations on a standardized test, and it was entirely appropriate for LSAC to conduct its own assessment of Mr. Bach's documentation and determine whether he is entitled to accommodations on the LSAT. *Cf. Ware v. Wyoming Bd. of Law Examiners*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997) ("Although information regarding past accommodations may be helpful . .

. ., the fact that a person has been granted a particular accommodation in the past does not mean that such accommodations are presumptively reasonable. Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."), *aff'd mem.*, 161 F.3d 19 (10th Cir. 1998). Indeed, the more relevant accommodation history for Mr. Bach is the fact that he has never been accommodated on a national standardized test, yet performed very well, and that his request for accommodations on the GMAT exam was denied.

Courts routinely look to objective evidence of individuals' actual performance on other standardized tests and/or in the academic environment in determining whether they are substantially limited in major life activities such as learning or reading (or any other activities implicated in the ability to take standardized tests). *See, e.g., Palotai*, 38 Fed. Appx. at 955; *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 155 (1st Cir. 1998); *Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F. Supp. 2d 607, 620-21 (S.D. Ind. 2012). Mr. Bach's profile is not one of an individual who is "substantially limited" in any major life activity relevant to taking the LSAT, particularly in light of his stellar academic and occupational history. *See, e.g., Love v. LSAC*, 513 F. Supp. 2d 206, 228 (E.D. Pa. 2007).

## CONCLUSION

Mr. Bach's request for injunctive and declaratory relief should be denied, and judgment entered in favor of LSAC.

Dated:  October 13, 2014                                Respectfully submitted,


                                                        /s/ Caroline M. Mew
                                                        Caroline M. Mew, NC Bar No. 26454
                                                        Robert A. Burgoyne
                                                        FULBRIGHT & JAWORSKI LLP
                                                        801 Pennsylvania Avenue, NW
                                                        Washington, D.C.  20004-2623
                                                        Telephone:     (202) 662-0200
                                                        Facsimile:     (202) 662-4643
                                                        caroline.mew@nortonrosefulbright.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| SEAN S. BACH, )<br>)<br>    **Plaintiff,** )<br>)<br>    **v.** )<br>)<br>LAW SCHOOL ADMISSION COUNCIL, )<br>INC., )<br>)<br>    **Defendant.** )<br>) | **Case No. 1:13-CV-00888-CCE-JLW** |

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have verified that such filing was sent electronically using the CM/ECF system to the following:

Mark James Kleinschmidt          Charles Weiner
Tin Fulton Walker & Owen, PLLC    Law Office of Charles Weiner
312 W. Franklin St., Ste. 2           Cambria Corporate Center
Chapel Hill, NC 27516             501 Cambria Ave.
                                    Bensalem, PA 19020

*Attorneys for Plaintiff*

Respectfully submitted,


/s/ Caroline M. Mew
Caroline M. Mew, NC Bar No. 26454
FULBRIGHT & JAWORSKI LLP
801 Pennsylvania Avenue, NW
Washington, D.C.  20004-2623
Telephone:     (202) 662-0200
Facsimile:      (202) 662-4643
caroline.mew@nortonrosefulbright.com