**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **SEAN S. BACH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:13-CV-00888-CCE-JLW** |
| ) | |
| **LAW SCHOOL ADMISSION COUNCIL,** ) | |
| **INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## LSAC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to L.R. 40.1(c), defendant Law School Admission Council ("LSAC") respectfully submits its proposed findings of fact and conclusions of law in this matter.

## FINDINGS OF FACT

A. **Parties**

1.     Plaintiff Sean Bach is a graduate of Bates College and the Duke University Fuqua School of Business.  He currently works as a Vice President for Pegasus Intellectual Capital Solutions, a boutique investment bank located in Chicago, Illinois.  He also is serving as an Associate in Research for Duke University Law School Professor Steven L. Schwarcz and as Special Advisor to the Chief Financial Officer of ReserveBar, an internet-based distributor of alcoholic beverages.

2.     Mr. Bach is registered to take the December 2014 administration of the Law School Admission Test ("LSAT"), and has requested accommodations of fifty percent extended testing time (18 extra minutes) on all sections of the LSAT and a private room in which to take the examination.  Mr. Bach claims to need extra time and private room accommodations on the

LSAT based on his diagnosed impairment of Attention-Deficit/Hyperactivity Disorder (ADHD), Predominantly Inattentive type. Mr. Bach contends that, as a result of his ADHD, he is substantially limited in the alleged major life activities of thinking, concentrating, learning, organizing, cognitive processing, reading, writing and test taking.

3. Defendant LSAC is a non-profit membership organization. LSAC provides services for its member schools and individuals who wish to attend law school, including developing and administering the LSAT examination.

4. The LSAT is a standardized test, and law schools across the country rely upon LSAT scores as one factor among many in evaluating admission applications. With limited exceptions, all examinees take the LSAT under the same testing conditions, including standard testing time. The primary exception is for disabled individuals who need reasonable accommodations. LSAC individually evaluates each request for testing accommodations that it receives to determine whether the candidate has demonstrated that he or she is disabled within the meaning of the Americans with Disabilities Act (ADA), as amended, and, if so, what accommodations would be appropriate.

5. Kim Dempsey, Psy.D., is the Manager of Accommodated Testing for LSAC. Dr. Dempsey personally evaluates each complete request for testing accommodations, and makes the final decision for LSAC as to whether the request will be granted or denied and what accommodations will be provided.

**B.** **Mr. Bach's Claimed Impairment**

6. Mr. Bach claims that, as a result of ADHD, he has experienced and continues to experience symptoms such as lack of focus, poor organization, distractibility, and failure to initiate or complete tasks. With respect to test taking in particular, Mr. Bach claims that he has

trouble finishing tests in a timely manner, but that with extra time, he is able to complete tests and show his mastery of the material being tested.

7.      Diagnostic guidelines for ADHD are set forth in the Diagnostic and Statistical Manual of Mental Disorders, the most recent edition of which is the Fifth Edition (DSM-5).

8.      ADHD is a neurodevelopmental disorder.  For a diagnosis of ADHD-predominantly inattentive presentation, the diagnostic criteria of the DSM-5 requires a persistent pattern of inattention that interferes with functioning or development.  Several symptoms must have been present before age 12.  The DSM-5 encourages clinicians to obtain "ancillary information" beyond self-report to establish childhood onset, as "[a]dult recall of childhood symptoms tends to be unreliable[.]"

9.      The DSM-5 diagnostic criteria also require that manifestations of ADHD be present in two or more settings (e.g., at home, school, or work; with friends and relatives; in other activities).  There must be clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning.  The DSM-5 instructs that "[c]onfirmation of substantial symptoms across settings typically cannot be done accurately without consulting informants who have seen the individual in those settings."

10.     Mr. Bach did not offer any testimony at trial from any individuals who knew him as a child or adolescent and who could corroborate his self-report of impairment as a child and adolescent.  For example, he has not provided testimony from his parents, siblings, or any of his teachers.  He has provided some grade and standardized test reports and some teacher comments on midterm reports for primary and secondary school, which will be addressed below.

11.     Mr. Bach also did not offer any testimony from any individuals who currently interact with him on a regular basis to corroborate his self-report of impairment as an adult.  For

example, he did not offer testimony from his long-term girlfriend or any teachers, co-workers, or work supervisors. He has provided some grade and standardized test reports for post-secondary school and LSAC has offered copies of Mr. Bach's resume; college, business school, and law school applications; and documents and information relating to Mr. Bach's current occupational endeavors, which will be addressed below.

12.     The DSM-5 sets out three levels of severity that are part of a diagnosis of ADHD:

Mild:  Few, if any, symptoms in excess of those required to make the diagnosis are present, and symptoms result in no more than minor impairments in social or occupational functioning.

Moderate:  Symptoms or functional impairment between "mild" and "severe" are present.

Severe:  Many symptoms in excess of those required to make the diagnosis, or several symptoms that are particularly severe, are present, or the symptoms result in marked impairment in social or occupational functioning.

13.     Thus, some clinicians may assign an ADHD diagnosis to individuals who show only mild symptoms that have limited impact on actual functioning.

14.     As LSAC expert witness, Dr. Michael Gordon, has explained, in recent years there has been a large increase in the rate of individuals diagnosed with ADHD. Thus, according to some reports, 15% of all high school students have been assigned a diagnosis of ADHD, while research estimates indicate that the actual prevalence of ADHD is closer to 5% of the population.

## C.     Mr. Bach's Standardized Testing History

15.     Mr. Bach has a history of strong performance on standardized tests, taken without extra testing time or any other accommodations.

16.     On the comprehensive tests of basic skills taken in kindergarten and first grade, Mr. Bach earned scores ranging from the 88th percentile to the 99th percentile (except for spelling, which was in the 65th percentile).

17.     On the Stanford Achievement Test in third grade, Mr. Bach earned scores ranging from the 92nd to the 99th percentile.

18.     On the Stanford Achievement Test in the fourth grade, Mr. Bach earned scores ranging from the 89th to the 99th percentile.

19.     On a standardized test taken in the fifth grade, Mr. Bach earned scores ranging primarily from the 89th to the 94th percentile, with one score in the 56th percentile.

20.     On the Stanford Achievement Test in the seventh grade, Mr. Bach earned scores ranging from the 71st percentile to the 99th percentile.

21.     On the Comprehensive Testing Program exam in eighth grade, Mr. Bach earned scores ranging from the 95th to 99th percentiles.

22.     Mr. Bach took the PSAT as a ninth-grader.  He scored in the 46th percentile on the verbal section, 74th percentile on the math section, and the 58th percentile on the writing skills section.

23.     Mr. Bach took the SAT college admissions test two times in his junior year of high school, scoring 630 on the reading section both times and 640 and 660, respectively, on the math section.  Mr. Bach has reported his scores as falling between the 84th and 87th percentiles.

24.     Mr. Bach took the ACT college admission test in the fall of his senior year in high school, scoring in the 93rd percentile nationally.   His subtest scores ranged from the 75th percentile to the 99th percentile.

25.     Mr. Bach took the Graduate Management Admission Test ("GMAT") in January 2010.  *See* Pl. Ex. 12.  GMAT scores are used by graduate school admission offices to help make decisions regarding admission to business school programs.   Mr. Bach's request for accommodations on this test was denied by the test sponsor, the Graduate Management

Admission Council, and he tested under standard conditions.  His composite score was in the 92nd percentile.  Mr. Bach reports his GMAT score on his resume and on his LinkedIn profile.

28.     Mr. Bach took the LSAT in February 2014 under standard testing conditions.  He scored in the 71st percentile.

27.     Mr. Bach has never received testing accommodations on any standardized test.

**D.      Mr. Bach's Academic History**

28.     Mr. Bach was a very successful student in primary and secondary school, without any academic accommodations.

29.     His kindergarten report card reflects satisfactory progress in all areas.  He received four S-minus marks in November of his Kindergarten year, and ten S-plus marks, and his marks in subsequent terms (January, March, and June) were all S or S-plus.

30.     In first grade, available report cards reflect A's and B's in all subjects except physical education, where Mr. Bach earned B's and C's.  In Language Arts, Mr. Bach's teacher commented that he was a "fine student" in reading, suggested that he did not always self-select books appropriate to his level, and noted that it takes him a long time to get started.  She also commented that Mr. Bach had done a "fine job" and that his "comprehension of reading materials is excellent."

31.     In second grade, Mr. Bach's father suggested that his son might be bored in school, and a teacher identified possible gifted testing for the next year.

32.     In third grade, Mr. Bach was an "outstanding student who especially excels at higher level thinking skills," and earned all A's for his final grades.

33.     In fourth grade, Mr. Bach's teacher noted that he "does well in all areas and performs satisfactorily[,]" and encouraged him to "put forth the effort . . . he is capable of . . . ." He was "a pleasure to have in class." His final grades were all A's.

34.     Mr. Bach was referred for a psychological evaluation in fourth grade "due to his excellent school progress." During testing, he "displayed an excellent attention span." The evaluator concluded that Mr. Bach demonstrated "many of the characteristics often associated with superior students[,]" and that "[h]is abilities are manifested in his academic achievement." No impairments were diagnosed, and there was no suggestion of any ADHD symptoms.

35.     Mr. Bach's final grades in fifth grade were all A's.

36.     Mr. Bach's final grades in seventh grade were all A's, except for one B.

37.     In eighth grade, Mr. Bach's final grades were all A's and B's, with one C+. Teacher comments reported positive characteristics ("good student," "cooperative student," "a pleasure to have in class," "always prepared for class," "applies learned concepts"), although "inconsistent effort" was noted in Spanish class (for which Mr. Bach's final grade was a B+) and "missing, late, or incomplete homework" was noted in American History (for which Mr. Bach's final grade was a C+). His "effort" and "conduct" scores across his twelve classes were all "very good" or "satisfactory," with the exception of one "needs improvement" in the first trimester of American History.

38.     In ninth and tenth grades, Mr. Bach earned A's, B's, and C's as final grades in his classes, including numerous honors classes.

39.     In eleventh and twelfth grades, Mr. Bach earned all A's and B's as final grades in his classes, including in many honors classes and three AP (Advanced Placement) classes in twelfth grade.

40.     Mr. Bach has provided nine high school mid-term reports where issues of effort and preparation were raised (along with many positive comments) with respect to a small number of Mr. Bach's thirty-one high school classes.  Most (five) of these reports are from the ninth grade, with one in tenth grade, and three from eleventh grade, including one report which noted that Mr. Bach's focus on the school play put him behind in Honors Calculus.

41.     It is impossible to draw any conclusions from these few mid-term reports, which contain both positive and negative anecdotal comments.  For example, in ninth grade, Mr. Bach's Geometry Honors midterm report reflects some constructive criticism, specifically, "Math is all about the underline(practice).  Sean applies concepts readily but doesn't always put in the time for practice." No inferences can reasonably be drawn from this comment in support of the later diagnosis of ADHD.   Indeed, this report also reflects numerous positive comments including:  "always prepared for class;" "computes accurately;" "grasps abstract concepts;" "participates well;" "asks meaningful and specific questions;" "positive attitude;" "courteous and considerate;" "highly motivated;" "behaves responsibly in class;" "seeks extra help as needed;" "positive influence on class;" "listens well;" and "displays interest."   And it is just as telling what comments are ***not*** marked on this particular report.  For example, there is no report that Mr. Bach is "inattentive in class," "inconsiderate of others," "lacks motivation," or "appears uninterested."  Nor are there any comments suggesting that he was unable to finish tests in the allotted amount of time.

42.     Mr. Bach participated in numerous extra-curricular activities in high school. Many weeks, he would spend significant hours participating in plays and other activities after

school. He was also very busy working in a job outside of school during high school, working as many as forty hours per week during the academic year.[1]

43.    Mr. Bach performed well enough in high school to earn admission to Bates College, a highly selective liberal arts college.

44.    Mr. Bach did not request or receive formal accommodations at Bates or seek assistance from the school's academic support center.

45.    As described in his Harvard Law School application, Mr. Bach experienced significant academic disruption during his time at Bates due to issues with his family's jewelry business. He took a semester off of school to return to Florida to deal with these business issues, and after returning to school, continued to work for Jewelry Depot during the academic year. Mr. Bach was also involved in various extracurricular activities at Bates. Despite these external time commitments, he was able to graduate in four years, majoring in Economics with a 3.21 GPA.

46.    Based upon his strong academic record and excellent GMAT score, which he accomplished without receiving any accommodations, Mr. Bach was admitted to and attended the Duke University School of Business, one of the top-rated business schools in the country. He graduated in May 2013 with a Master of Business Administration degree, a 3.651 GPA, and a Certificate of Excellence in Finance.

---

[1] In his application to Harvard Law School, Mr. Bach reported that he worked full-time for Jewelry Depot, 40 hours per week, for the time period from February 2001 to May 2008, which includes the time Mr. Bach was a high school and college student. In his application to Bates College, however, Mr. Bach reported that he worked at Jewelry Depot "as needed" during school and thirty hours per week during vacation. Mr. Bach has admitted to understating the amount he worked during high school in his application to Bates, based on the advice of his advisor. In his interrogatory responses, Mr. Bach testified that he worked 5 hours per week during high school (30 hours per week during high school breaks), and 5-30 hours per week during college (70-80 hours per week during breaks).

47.     While at Duke, Mr. Bach was approved to receive accommodations of 50% extra time on tests and quizzes and a minimal-distraction testing area.  He did not receive accommodations in any context other than testing.

E.     **Mr. Bach's Psychological Evaluations**

48.     When Mr. Bach was in fourth grade, he was referred for a psychological evaluation "due to his excellent school progress."

49.     Mr. Bach's mother reported at the time that "he loves school, and  . . . is getting a good education.  However, she would like to have Sean experience more challenges with his school work."

50.     According to information provided at the time by Mr. Bach's teacher, Mr. Bach "impresses as a very bright youngster, who displays many of the behavioral characteristics evident in superior children, particularly in the areas of learning, leadership, motivation, creativity, and planning."

51.     The evaluating psychologist noted, among other things:  "Sean displayed an excellent attention span and he was eager to do well.  He projected self-confidence, appearing to be mature and responsible."

52.     Mr. Bach's testing during this psychological evaluation showed intellectual functioning in the Very Superior range, with strengths in verbal comprehension skills and ability to utilize common sense in social problem solving.  It was noted that his abilities were reflected in his academic achievement.

53.     Mr. Bach subsequently was recommended to participate in a "Highly Gifted Pilot Program."

54.     Mr. Bach did not undergo any additional psychological testing until he was twenty-three years old.  Mr. Bach self-referred to Enrique Rivera, Ph.D., because he reportedly had been "experiencing significant difficulties with test taking for most of his academic life."  He pursued this evaluation for the specific purpose of seeking accommodations on the GMAT examination, which is the test required for admission to most business schools in the United States.

55.     The only problem that Mr. Bach reported to Dr. Rivera during this evaluation was taking timed tests.  He did not report having problems in multiple settings, and in fact noted that he was "doing very well in his current position in the family business."

56.     During the testing performed by Dr. Rivera, Mr. Bach scored in the 99th percentile on his test of intelligence.  All of his intelligence subtest scores were significantly above average, with the exception of his score on the Digit Symbol subtest, which was average.

57.     Mr. Bach's achievement test scores were all well above average, with the exception of his Word Reading test, which was at the 63rd percentile (still above average).  Dr. Rivera noted a deficiency in word reading "only relative to [Mr. Bach's] exceptional overall level of intellectual functioning."  Dr. Rivera also noted difficulties in Mr. Bach's auditory processing, "once again relative to his exceptional intellectual functioning[.]"

58.     In his Summary and Conclusions, Dr. Rivera found:  "Sean Bach . . . is functioning within the Very Superior intellectual range.  Because the discrepancy between his exceptional intellectual potential and his achievement scores is large enough, it is apparent that he presents some level of reading difficulties most likely as a result of auditory processing problems. . . .  Sean's results clearly indicate weaknesses in reading and [*sic*] specially when it is

considered on the backdrop of his intellectual functioning. His composite reading was at the 87th percentile which is significantly low in his specific case."

59.     Dr. Rivera diagnosed Mr. Bach with ADHD, Predominantly Inattentive Type, and recommended that Mr. Bach be allowed more time in taking tests. The information conveyed in Dr. Rivera's report does not address the diagnostic criteria for ADHD or show how or why Mr. Bach met the diagnostic criteria for ADHD.

60.     Mr. Bach submitted Dr. Rivera's report in support of his request for testing accommodations on the GMAT. His request for accommodations was denied by the test's sponsor. He tested without accommodations, and scored in the 92nd percentile. Stated differently, he scored in the top 8% of everyone who took the GMAT contemporaneously with him.

61.     Mr. Bach received an updated psychological assessment from Mandi Singer, Ph.D., in July 2013. Mr. Bach sought out this evaluation specifically because he intended to seek testing accommodations on the LSAT.

62.     In her "Behavioral Observations During Testing," Dr. Singer reported, in part: "Sean was well oriented during the assessment and displayed typical energy, attention, and concentration for his age. His conversational proficiency seemed typical for his age and education level. He was talkative and cooperative throughout the assessment. Sean gave good effort on all tasks and generally persisted when he found something difficult."

63.     Dr. Singer measured Mr. Bach's intellectual ability using the Weschler Adult Intelligence Scale, 4th Edition (WAIS-IV). Mr. Bach's full scale IQ was shown to be High Average (84%).

64. In Dr. Singer's testing, Mr. Bach's achievement test scores were all in the Average to Superior range using age-equivalent norms. Dr. Singer wrote, "Sean's achievement is what would be expected based on his IQ scores, suggesting he is using his intellect well and fulfilling potential, at least on a test such as this. Also, because he is performing [*sic*] expectations, there is no indication of general cognitive disturbances that might be observed during episodes of active mood disorders or interference due only to anxiety. There are also no indications of a subject specific learning disorder impacting Sean's academic functioning."

65. Dr. Singer also administered the Connor's Continuous Performance Task (CPTII), "a computerized attention task that requires respondents to press the space bar after evaluating whether or not the presented letter is an 'X.'" Mr. Bach's overall performance on this test resulted in a "no decision" profile, which is a profile "that cannot effectively demonstrate ADHD, but cannot rule it out, either."

66. Dr. Singer also administered the Nelson-Denny Reading Test (NDRT) to Mr. Bach. His scores under standard time conditions were all in the average range according to first semester college norms, with the exception of his reading rate, which was in the 5th percentile. Although Dr. Singer found Mr. Bach's reading speed to be "worrisome," she saw no other indications on the NDRT of a reading disorder or dyslexia, and she did not diagnosis him with a reading disorder or dyslexia. The Court concludes that Mr. Bach's NDRT reading rate score is an outlier.

67. In her evaluation, Dr. Singer opined that, "[i]n order for ADHD to be diagnosed, an individual must meet behavioral criteria as well as show differences between his general ability and the speed at which he is able to process information." This is not, however, the standard set out in the DSM-IV-TR or DSM-5 for the diagnosis of ADHD.

68. In her summary and recommendations, Dr. Singer stated, among other things, that Mr. Bach's "high intelligence and ability to adapt helped him be successful in school prior to receiving accommodations, though that scholastic performance was not a true representation of Sean's ability levels." She further stated that Mr. Bach "did fine, even above average on most classes and standardized tests, but he probably could have performed even better with earlier diagnosis, treatment, and appropriate accommodations." Dr. Singer concluded that, based on his psychological test scores, Mr. Bach met the criteria for ADHD, inattentive type (mild to moderate). Dr. Singer recommended that Mr. Bach receive 50% additional testing time on all portions of any standardized test and be allowed to test in a separate room.

69. Dr. Singer's report does not offer any opinion as to whether Mr. Bach is substantially limited in reading or other activities relating to test-taking compared to most people in the general population. She does not offer an opinion as to whether he is disabled within the meaning of the ADA.

70. In her axial diagnosis pursuant to the DSM-IV-TR, Dr. Singer assessed Mr. Bach's Global Assessment of Functioning (GAF) at the time of assessment (Axis V) as 83. Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. According to the DSM-IV-TR, a GAF level of 83 represents: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."

71. After LSAC denied his first request for testing accommodations, Mr. Bach sought an additional evaluation from James Byassee, Ph.D., again for the specific purpose of obtaining testing accommodations on the LSAT. Dr. Byassee administered one computerized attention

test and had Mr. Bach fill out additional self-rating behavioral scales.  Dr. Byassee also reviewed some of Mr. Bach's childhood report cards.

72.     Dr. Byassee's office administered visual and auditory Tests of Variable Attention (TOVA).

73.     The testing done by Dr. Byassee's office revealed three deviant-level final scores on the Visual TOVA, from which Dr. Byassee concluded that "[o]verall, Mr. Bach's test results strongly indicate the presence of an attention problem."   Dr. Byassee also acknowledged, however, a number of unusual issues with Mr. Bach's testing results.  First, Dr. Byassee noted: "Both *Response Times* and the *Variability* in Mr. Bach's response time scores were significantly deviant for the entire test, with the exception of a borderline score on the second quarter for *Response Time*.  This sometimes indicates an examinee strategy to try to minimize errors by taking as long as possible before responding.  In some cases, it can help to have the client re-take the visual TOVA and be told directly to be particularly careful to equally balance accuracy and speed."[2]  Second, Dr. Byassee noted that there were "some outside circumstances that may have interfered with [Mr. Bach's] adjustment to the testing."   There was a glare on the computer screen that Mr. Bach found distracting, and the initial test was interrupted by a phone call and had to be restarted.  According to Dr. Byassee, "Mr. Bach found this aspect of his testing time to be very distracting and feels it partly accounts for the trouble that he had with the visual testing."

74.     Mr. Bach performed much better on the auditory TOVA, where there were not the same "unusual issues" with his testing.

_____

[2] In Mr. Bach's report for the visual Test of Variables of Attention (TOVA), the "symptom exaggeration index" cautions, with respect to his results:  "Based on the subject's pattern of performance, there is some evidence of possible symptom exaggeration.  If the potential exists for secondary gain, a deliberate effort to exaggerate symptoms should be considered."

75.     Dr. Byassee concluded based on all of the TOVA testing: "Collectively, the two TOVA CPTs support the presence of serious attention problems in both visual and auditory realms.  Mr. Bach also had several findings that may reflect attentional difficulties, but could be unusual response strategies or his own idiosyncratic efforts to handle the attentional requirements of the test."

76.     Dr. Byassee had Mr. Bach fill out a number of behavioral questionnaires to further assess him.  Although it is helpful to have other individuals who are familiar with the patient fill out such scales (e.g., parents, significant others, employers), no other individuals filled out these scales for Mr. Bach.

77.     On the first questionnaire, the Barkley Adult ADHD Rating Scale-IV (BAARS-IV), Mr. Bach endorsed a clinical level of symptoms for only 3 of the nine symptoms of inattention.  Under the DSM-5, at least five symptoms must be present to support a diagnosis.

78.     On the second questionnaire, the Barkley Deficits in Executive Functioning Scale (BDEFS):  Self-Report, Mr. Bach had an elevated, but normal total score.

79.     On the last questionnaire used by Dr. Byassee, the Barkley Functional Impairment Scale (BFIS-LF), Mr. Bach self-reported "severe" levels of impairment in his work/occupation and in educational activities, and "moderate" levels of impairment in home and immediate family activities and managing household and chores.

80.     Dr. Byassee concluded that Mr. Bach's clinical history and various historical documents were consistent with an individual who had ADHD symptoms of impairment as a child, noting, in part:

> Likely because of his intelligence, he was successful generally as a student, with some degree of waxing and waning, which is also typical of a gifted student with ADHD.  He was able to compensate and reach levels of academic excellence,

although again as is often found among ADHD students, he was unable to maintain that level of persistence compensatory performance all of the time.

Dr. Byassee noted "deficits" in Mr. Bach's neuropsychological processing speed, as well as deficits in reading speed, writing speed, and math speed, not in an absolute sense, but "all relative to Mr. Bach's Superior IQ score." He concluded that Mr. Bach should receive time-and-a-half extended time on tests and a private, non-distracting room. He did not explain how he arrived at this amount of recommended extra testing time.

81.    It is Dr. Byassee's opinion that Mr. Bach has a "mild" manifestation of ADHD.

**F.    Mr. Bach's Psychiatric Evaluation and Treatment**

82.    Mr. Bach came under the care of Ellen Walker, M.D., a psychiatrist, in October of 2011. Mr. Bach identified his presenting problem as: "always required extra time to finish school." He also reported that he had a history of a major depressive disorder in 2004.

83.    Based on her initial meeting with Mr. Bach and his self-report, Dr. Walker diagnosed Mr. Bach with ADHD and major depressive disorder in remission. Based upon that diagnosis, she prescribed various medications to Mr. Bach. On her axial diagnosis, Dr. Walker assessed Mr. Bach at the GAF level of 65, indicating: "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

84.    It is Dr. Walker's opinion that the severity of Mr. Bach's ADHD symptoms is "mild."

85.    When Mr. Bach was engaged in his internship with MD Global in New York City during the summer of 2012, he informed Dr. Walker that his internship was "going well" and he

was "able to keep up." In September of 2012, Mr. Bach informed Dr. Walker that he had a "midday – drop off" but his "attention [was] good other times." In October 2012, Mr. Bach informed Dr. Walker that his attention was "good" and his focus was "good." School was "going well." In September of 2013, Mr. Bach again informed Dr. Walker that his attention was "good." In March 2014, Mr. Bach informed Dr. Walker that his attention is "OK" if he is taking Adderall.

**G.**     **Mr. Bach's Evaluation by Lenard Adler**

86.     Mr. Bach obtained an additional evaluation for purposes of this litigation from his proposed expert witness, Lenard Adler, M.D. Dr. Adler had Mr. Bach and his girlfriend fill out another set of behavioral questionnaires. He did not perform any additional testing.

87.     Dr. Adler met with Mr. Bach for approximately one hour and reviewed his prior testing and educational records. He concluded that Mr. Bach was properly diagnosed with ADHD. In his expert report, Dr. Adler assigned a GAF score of 72, which means: "If symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty in concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." During his deposition, however, and without having performed any additional testing or evaluations, Dr. Adler changed his testimony to opine that Mr. Bach's GAF score was closer to a 65. This level of impairment, however, is still relatively mild, as discussed above in conjunction with Dr. Walker's assessment.

88.     Dr. Adler recommends accommodations for Mr. Bach on the LSAT based on his ADHD diagnosis.

**H.**    **Mr. Bach's Occupational History**

89.    Mr. Bach is currently working in Chicago, Illinois, as a Vice President for Pegasus Intellectual Capital Solutions, a boutique investment bank.  In recruiting employees, Pegasus informs prospective applicants that "a strong work ethic and the highest attention to detail are mandatory."

90.    Mr. Bach also is currently working as an Associate in Research for Duke University Law Professor Steven L. Schwarcz and as a Special Advisor to the Chief Financial Officer of ReserveBar, an online distributor of alcoholic beverages.

91.    Mr. Bach previously served successfully as a Summer Associate, Mentored Study Associate, and Senior Associate in the Investment Banking Division of MD Global Partners, LLC, in New York City.  In these positions he created comprehensive financial models and detailed business, market, and valuation analyses; performed complex screening processes to identify specific investor universes for several transactions; "sourced" a list of several hundred appropriate investors, performing an individual analysis of suitability for each; and designed and co-created a Confidential Information Memorandum, consisting of nearly 50 pages and 28 custom tables, charts, and graphs.  Mr. Bach did not seek or receive any accommodations in this work environment.

92.    Mr. Bach is also the co-founder and Vice President of Jewelry Depot, a jewelry business that he formed with his parents when he was in high school.  According to Mr. Bach, he developed the Jewelry Depot into one of the largest single-standing retail jewelry stores in the Southeastern United States, after he negotiated and executed a multi-stage acquisition, authored all of the M&A agreements, and effectively quintupled the size of his company.  He also forged a new, high-quality supply pipeline in key East Asian markets.

## CONCLUSIONS OF LAW

93.     The ADA requires entities offering examinations relating to applications for post-secondary education to offer such examinations in a place and manner accessible to persons with disabilities or to offer alternative accessible arrangements for such individuals.  42 U.S.C. § 12189.  LSAC is a covered entity under this section.

94.     In order administer an examination in an accessible manner to an individual who is disabled within the meaning of the ADA, it may be necessary to provide reasonable accommodations to an examinee, such as testing modifications or auxiliary aids.

95.     To prevail on a claim under 42 U.S.C. § 12189, Mr. Bach must show that he is a person with a disability, that his requests for accommodation are reasonable, and that his requests were denied.  *See Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 608 (S.D. Ind. 2012) (citation omitted).

96.     To show that he is disabled within the meaning of the ADA, Mr. Bach must prove that he has a "physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  An impairment is a disability if it substantially limits an individual in performing a major life activity as compared to most people in the general population.  *See, e.g., Weaving v. City of Hillsborough*, 763 F.3d 1106, 2014 U.S. App. LEXIS 15762, at *16-21 (9th Cir. Aug. 15, 2014); *Crowell v. Denver Health & Hosp. Auth.*, No. 1301355, 2014 U.S. App. LEXIS 13965, at *21 (10th Cir. July 23, 2014); *cf.* 29 C.F.R. § 1630.2(j)(1)(ii).

97.     Mr. Bach has not shown that he is disabled within the meaning of the ADA.

98.     There is a significant question whether Mr. Bach suffers from any physical or mental impairment.  Although Mr. Bach has been diagnosed with ADHD, the diagnosis is not

consistent with applicable diagnostic criteria. There is no compelling evidence beyond Mr. Bach's own self-report that he was impaired due to ADHD-type symptoms during his childhood or early adolescence. Mr. Bach performed well in school, and had no reported problems in social settings. When he underwent a psychological evaluation in fourth grade (due to his excellent school performance, not because he was experiencing problems), he was found to be "a very bright youngster, who displays many of the behavioral characteristics evident in superior children, particularly in the areas of learning, leadership, motivation, creativity, and planning." *Cf. Steere v. George Washington Univ. Sch. of Med. & Health Sci.*, 439 F. Supp. 2d 17, 21-22 (D.D.C. 2006) (finding that plaintiff's "scraps of vague memories" of symptoms common to young children was not enough to satisfy the ADHD early-onset requirement).

99. Mr. Bach also has not shown impairment from ADHD-type symptoms in his adolescence or early adulthood. In high school, Mr. Bach was active in extra-curricular activities and successfully managed a demanding course load at a college preparatory school while also remaining heavily involved in running his family business. Mr. Bach was successful in college and graduate school, and has followed his success in his family business with a strong work history post-business school. In his own words, Mr. Bach is an "Experienced Investment Banking Professional, Seasoned Entrepreneur, and Legal Scholar." This is not the profile of an individual who is experiencing meaningful impairment as a result of any ADHD-like symptoms. *See, e.g., Love v. LSAC*, 513 F. Supp. 2d 206, 225-26 (E.D. Pa. 2007); *Steer*, 439 F. Supp. 2d at 21-22 ("Had he the disability he claims to have, this Court might expect his achievement to have been more consistently impaired. Instead, plaintiff's educational career demonstrates strong academic achievement and ability . . . .").

100.    According to LSAC's expert witness, Dr. Michael Gordon, "The facts of this case are as far from being supportive of an ADHD diagnosis as I can recall ever encountering in my 18 years of reviewing documentation submitted in support of ADA-related accommodations."

101.    Nevertheless, even if Mr. Bach's ADHD diagnosis is accepted at face value, merely having a diagnosed impairment is not enough to show that he is disabled within the meaning of the ADA.  *See, e.g., Mann v. Louisiana High Sch. Athletic Assoc.*, No. 12-30961, 2013 U.S. App. LEXIS 14084, at *11 (5th Cir. July 11, 2013) (noting plaintiff must show "substantial limitation," and reversing grant of preliminary injunction because diagnosis of anxiety disorder, standing alone, was insufficient to show disability under the ADA as amended by the ADA Amendments Act); *Rudolph v. Buncombe Cty. Gov't*, 846 F. Supp. 2d 461, 471 (W.D.N.C. 2012) ("Having ADHD . . . does not necessarily dictate that the Plaintiff was disabled."), *aff'd*, 474 Fed. Appx. 931 (4th Cir. 2012); *cf. Costello v. UNC*, No. 03-1050, 2006 U.S. Dist. LEXIS 90519, at *12 (M.D.N.C. Dec. 14, 2006) ("[A] mere medical diagnosis of an impairment is insufficient to prove disability status.") (summary judgment to defendant on Rehabilitation Act claim).

102.    In the ADA Amendments Act of 2008 ("ADAAA"), Congress emphasized that the statute should be construed to provide "broad coverage."  42 U.S.C. § 12102(4); *see also Summers v. Altarum Instit.*, 740 F.3d 325, 329 (4th Cir. 2014).  However, "[a]lthough the text of the ADAAA expresses Congress's intention to broaden the definition and coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination."  *Neely v. PSEG Texas, LP*, 735 F.3d 242, 245 (5th Cir. 2013); *cf. Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 n.10 (4th Cir. 2012) (noting plaintiff had not proven himself to be disabled under either the original version of the ADA or under the

ADAAA); *Scavetta v. Dillon Cos.*, No. 13-1311, 2014 U.S. App. LEXIS 12133, at *8-9 (10th Cir. June 27, 2014) (reiterating that there is no "per se" disability under the ADAAA) (citation omitted).[3]

103.    Mr. Bach claims to be substantially limited in the major life activities of thinking, concentrating, learning, organizing, cognitive processing, reading, writing, and test taking.[4]  The record evidence does not establish that Mr. Bach has any impairment that substantially limits him in any of the major life activities that he references, when compared to most people in the general population.[5]  Mr. Bach's own treating psychiatrist, Dr. Walker, describes his level of impairment as "mild," as does his evaluating psychologist, Dr. Byassee.  Another one of Mr. Bach's evaluators, Dr. Singer, described his level of impairment as mild-to-moderate, and ascribed him a GAF score of 83 under the DSM-IV-TR, reflecting absent or minimal symptoms and good functioning.

---

[3] Mr. Bach's alleged functional limitations must be compared to members of the general population, not, for example, to other college graduates who are interested in attending law school, *see Singh v. George Washington Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007), or his own intellectual "potential."

[4] The Court assumes that the activities of thinking, concentrating, learning, reading and writing are major life activities for the purpose of this analysis.  Mr. Bach has not explained how "cognitive processing" is any different than thinking, concentrating, or learning, or how cognitive processing constitutes a distinct major life activity.  Mr. Bach also has failed to show that "organizing" is a major life activity, or that it is relevant to his ability to take the LSAT.  The Court agrees with other courts which have concluded that test taking is not a major life activity. *See Singh*, 508 F.3d at 1104; *Herzog v. Loyola College*, No. 07-2416, 2009 U.S. Dist. LEXIS 94454, at *16 n.4 (D. Md. Oct. 9, 2009); *Baer v. Nat'l Bd. of Med. Examiners*, 392 F. Supp. 2d 42, 47 (D. Mass. 2005).  Moreover, even if test taking was assumed to be a major life activity, Mr. Bach has not shown that he is substantially limited in his ability to take tests compared to most people in the general population, as discussed below.  To the contrary; he performs extremely well on tests, without accommodations.

[5] Despite the litany of life activities purportedly at issue, Mr. Bach's evaluators have focused on his alleged impairment with respect to taking timed tests.

104.    Most telling is Mr. Bach's long history of high standardized test scores and consistent academic and occupational successes, achieved without any accommodations, which belie any argument that he is "substantially limited" in any activity relevant to taking the LSAT.

105.    Mr. Bach's standardized test history is stellar.  He has performed well above average on every standardized test he has ever taken, based on the record evidence offered at trial.  This includes well-above average performance on tests taken solely by college students or college graduates seeking admission to graduate school:  the GMAT (92nd percentile) and the LSAT (71st percentile).  Mr. Bach and his evaluators may think that these test scores do not reflect his full potential, but that is not the test for disability under the ADA.  Nothing in his testing performance shows an individual who is substantially limited compared to most people in the general population.

106.    Mr. Bach's academic and occupational records are just as strong.  Mr. Bach earned A's and B's throughout primary school, and mostly A's and B's in high school while taking many honors classes.  Mr. Bach graduated in four years from Bates College despite experiencing reportedly significant disruptions from his family business, earning a 3.2 GPA.  All of this occurred without any formal accommodations.  Mr. Bach also performed very well in business school at Duke University.[6]

---

[6] Mr. Bach attributes this success to the fact that he received extra time for tests and quizzes and a private testing room, but this success could also be attributed to Mr. Bach's focus on his schoolwork (he ceased working actively for the Jewelry Depot once he began business school at Duke) or his high interest in the subject matter.  The fact that he was allowed accommodations on tests and quizzes in business school is not dispositive in all events on the question whether he is in fact disabled or entitled to accommodations on the LSAT.  That isolated instance of prior accommodations is at odds with Mr. Bach's exceptional performance without any accommodations from elementary school through college, on a range of standardized tests, and in the work environment.

107.     Mr. Bach also has been a highly successful entrepreneur and businessman, achieving success in his family business at an early age and continuing to perform well in the demanding world of investment banking.

108.     Mr. Bach's record demonstrates that he is not disabled within the meaning of the ADA.  *See, e.g., Rumbin v. Assoc. of Am. Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Conn. 2011) (rejecting ADA claim by individual who was denied accommodations on the MCAT exam); *Herzog*, 2009 U.S. Dist. LEXIS 94454, at *19 ("Herzog's academic successes demonstrate his ability to perform at an above-average level both before and after being diagnosed with ADHD.").  As the Court previously concluded in denying Mr. Bach's motion for preliminary injunction, "Mr. Bach's long history of academic success weighs against a finding of disability." *Bach v. LSAC*, No. 1:13-cv-888, 2014 U.S. Dist. LEXIS 124632, at *4 (M.D.N.C. Feb. 4, 2014) (citations omitted).[7]

109.     Mr. Bach may believe he makes errors at work due to ADHD, had trouble completing reading assignments in school, or has trouble finishing difficult tests under standard time conditions, but these are merely his subjective beliefs, and do not show that Mr. Bach is substantially limited in his ability to think, concentrate, read, organize, or learn compared to most people.  *See, e.g., Fuoco v. Lehigh Univ.*, 981 F. Supp. 2d 352, 365 (E.D. Pa. 2013) (granting summary judgment to defendant where plaintiff offered only speculative and subjective belief that her problems were due to ADHD or that she was substantially limited in her ability to think,

---

[7] Courts routinely look to objective evidence of an individual's actual performance on other standardized tests and/or in the academic environment in determining whether the individual is substantially limited in major life activities such as learning or reading (or any other activities implicated in the ability to take standardized tests).  *See, e.g., Palotai v. Univ. of Maryland*, 38 Fed. Appx. 946, 955 (4th Cir. 2002) (unpublished); *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 155 (1st Cir. 1998); *Healy*, 870 F. Supp. 2d at 620-21; *Love*, 513 F. Supp. 2d at 22.

learn, or work compared to most people); *cf. Singh v. George Washington Univ. Sch. of Med. & Health Sci.*, 667 F.3d 1, 5-6 (D.C. Cir. 2011) (affirming district court judgment in favor of GWU where plaintiff failed to prove that any limitation in learning was due to an impairment, because there were many other reasons to explain plaintiff's alleged difficulties, including anxiety, being over-extended in extra-curricular activities, and poor study habits).

110. Neither LSAC nor the Court is required simply to defer to the conclusions reached by Mr. Bach's evaluators in determining whether he is disabled within the meaning of the ADA and entitled to testing accommodations on the LSAT. This is particularly the case when Mr. Bach's evaluators failed to consider whether Mr. Bach was disabled within the meaning of the ADA, *i.e.*, substantially limited compared to most people. *See, e.g., Palotai*, 38 Fed. Appx. at 955; *Rhodes v. Langston Univ.*, 462 Fed. Appx. 773, 778 (10th Cir. 2011) ("Rhodes' neuropsychological evaluation does not answer the question of whether his impairment substantially limits Rhodes' ability to learn as a whole for purposes of daily living, as compared to most people. Rather, it is a comparison to a fictional person sharing his demographic characteristics and its purpose was to identify potential accommodations to help Rhodes with demanding classroom and clinical nursing courses.").[8] Mr. Bach's evaluators also have not demonstrated that extra time testing accommodations on the LSAT are reasonable and appropriate for Mr. Bach, even if one credits their diagnosis of ADHD.

---

[8] Both LSAC's in-house expert, Dr. Dempsey, and its testifying expert, Dr. Gordon, have testified regarding the distinction between a clinical diagnosis of ADHD and a finding that someone is disabled within the meaning of the ADA. In this case, the evidence indicates that Mr. Bach's evaluators did not apply the standards of the ADA, and assumed that Mr. Bach should be entitled to testing accommodations on the LSAT based solely on his diagnosed impairment.

111.     Similarly, LSAC is not required to simply follow the decision that Duke University made to grant Mr. Bach's request for accommodations in business school. Receiving accommodations in an academic context is very different from receiving accommodations on a standardized test, and it was entirely appropriate for LSAC to conduct its own assessment of Mr. Bach's documentation and determine whether he is entitled to accommodations on the LSAT.  *Cf. Ware v. Wyoming Bd. of Law Examiners*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997) ("Although information regarding past accommodations may be helpful ..., the fact that a person has been granted a particular accommodation in the past does not mean that such accommodations are presumptively reasonable.  Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."), *aff'd mem.*, 161 F.3d 19 (10th Cir. 1998).   Indeed, it appears that Duke University provided Mr. Bach with academic accommodations based solely on Dr. Rivera's stated diagnosis of ADHD, even though nothing in his evaluation report substantiates or reflects that Mr. Bach met the diagnostic criteria for the disorder.  The more relevant accommodation history for Mr. Bach is the fact that he has never been accommodated on a national standardized test yet performed very well on such tests, including the GMAT, where his request for accommodations was denied.

112.     Given all the evidence presented, the Court is not persuaded that Mr. Bach has a disability as defined under the ADA.  His request for injunctive and declaratory relief is therefore denied, and judgment will be entered in favor of LSAC.

Dated:  October 13, 2014                    Respectfully submitted,


                                           /s/ Caroline M. Mew
                                           Caroline M. Mew, NC Bar No. 26454
                                           Robert A. Burgoyne
                                           FULBRIGHT & JAWORSKI LLP
                                           801 Pennsylvania Avenue, NW
                                           Washington, D.C.  20004-2623
                                           Telephone:     (202) 662-0200
                                           Facsimile:     (202) 662-4643
                                           caroline.mew@nortonrosefulbright.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **SEAN S. BACH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:13-CV-00888-CCE-JLW** |
| ) | |
| **LAW SCHOOL ADMISSION COUNCIL,** ) | |
| **INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2014, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system and have verified that such filing was sent

electronically using the CM/ECF system to the following:

Mark James Kleinschmidt    Charles Weiner
Tin Fulton Walker & Owen, PLLC  Law Office of Charles Weiner
312 W. Franklin St., Ste. 2    Cambria Corporate Center
Chapel Hill, NC 27516     501 Cambria Ave.
            Bensalem, PA 19020
      *Attorneys for Plaintiff*

       Respectfully submitted,


       /s/ Caroline M. Mew
       Caroline M. Mew, NC Bar No. 26454
       FULBRIGHT & JAWORSKI LLP
       801 Pennsylvania Avenue, NW
       Washington, D.C.  20004-2623
       Telephone:  (202) 662-0200
       Facsimile:  (202) 662-4643
       caroline.mew@nortonrosefulbright.com